IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MARK WILLIAMS,

                         Plaintiff,                        OPINION AND ORDER

    v.

                                                  11-cv-407-wmc

HOLLY MEIER and CHARLES LARSON,

                         Defendants.

---

In this 42 U.S.C. § 1983 action, plaintiff Mark Williams, an inmate at Fox Lake Correctional Institution, alleges that defendants Holly Meier and Dr. Charles Larson violated his Eighth Amendment rights in failing to treat a serious medical need, related to his diabetes condition.  Defendants have moved for summary judgment.  (Dkt. #7.)  Because the court finds that no reasonable jury could find defendants acted with deliberate indifference to Williams' medical condition, the court grants defendants' motion for summary judgment.

UNDISPUTED FACTS

In response to defendants' proposed finding of facts, Williams states that he adopts the defendants' proposed findings of facts with the exception of certain paragraphs, which he then lists.  (Pl.'s PFOFs. (dkt. #17) ¶ 1.)  The court understands this to mean that Williams disputes these findings, but he fails to "state [his] version of the fact and refer to evidence that supports that version" as required in the court's Procedure to be Followed on Summary Judgment.  (Prelim. Pretrial Conf. Order (dkt. #4) p.18.)  Nonetheless, the court has considered plaintiff's own proposed findings of

fact in determining whether a genuine issue of material fact exists with respect to those facts proposed by defendants. With that caveat, the court finds the following facts taken from the parties' proposed findings of fact to be material and undisputed.

## I.  The Parties

Plaintiff Mark Williams was confined at all times material to this action at Fox Lake Correctional Institution ("Fox Lake"). Fox Lake is a medium-security institution located in Sturtevant, Wisconsin. Williams was transferred from the Green Bay Correctional Institution to Fox Lake on January 16, 2009. Williams was regularly seen by the Fox Lake Health Services Unit ("HSU") for medical treatment from that date until his release on November 30, 2010.

Defendant Charles Larson, M.D. is currently employed by the Wisconsin Department of Corrections ("DOC") as a physician at Fox Lake. Defendant Holly Meier is a registered nurse. Since October 14, 2007, Meier has been employed by the DOC as the health services manager at Fox Lake. As the health services manager, Meier works with the primary care physician, as well as specialists serving as consultants to the Wisconsin Bureau of Health Services ("BHS"), to provide health care to the Fox Lake inmates.

## II. General Management of Williams' Diabetes

In 2004, Williams was diagnosed with Type 2 diabetes, a chronic condition that affects the way the body metabolizes sugar (glucose). There is no cure for Type 2

diabetes, but it can be managed through diet and exercise, diabetes medications or insulin therapy.   Untreated Type 2 diabetes can lead to long-term complications and ultimately be life-threatening.

Upon Williams' transfer to Fox Lake, Nurse Lisa Panten reviewed his medical record.   At that time, his medical classification was "any activity" and no medical restrictions or special needs were noted in his medical record.   Panten nevertheless scheduled him to be seen by the diabetic chronic condition clinic in February 2009.   She also scheduled lab tests related to his Type 2 diabetes, which were completed on January 21, 2009.

On February 19, 2009, Williams completed a Diabetes Treatment Plan form and was seen by nurse practitioner Kristine Lyons for his diabetes and lab follow-up.   On the form, Williams noted hyperglycemic episodes and indicated that he had neuropathy symptoms, such as numbness in his feet.[1]   The plan required that Williams was to self-monitor his blood glucose.   The treatment plan also included information about (1) pharmalogical therapy, including insulin and Metformin;[2] (2) interventions, including visits every three months, lab test monitoring, nutritional evaluation, bedtime snacks, lifestyle medications, cardiovascular, kidney, eye, foot and oral care; (3) and various topics of self-management education.   Williams' lab results showed that his glycosylated hemoglobin ("A1C") test was 6.4, which was higher than Williams' previous reference

---

[1] Hypoglycemia is high blood sugar.  There are many causes, including eating too much, being sick, or not taken enough glucose-lowering medication.

[2] Metformin is a diabetes medication that lowers glucose production in the liver.

range of 3.9 to 6.1.   During his February 19th appointment, Lyons also noted that Williams' blood sugars were now measuring 170 to 223 prior to lunch.   Before his transfer to Fox Lake, Williams' blood sugars were measuring at about 150.

As a result of these changes, Lyons updated Williams' care plan, increasing his insulin dosage and instructing Williams about this adjustment.   Williams inquired as to why Fox Lake did not have available diabetic syrup and artificial sweeteners at meals. Lyons said she would check into that for him.   Williams also asked about custom orthotics, claiming that his prior pair had been thrown out at a different correctional facility.   Noting in his record that Williams did have custom orthotics made in 2005, Lyons also indicated that a review of his chart would be done to investigate the orthotic need.   Lastly, Lyons ordered a diabetes management follow-up appointment and lab testing in three months.

At Fox Lake, diabetic inmates on insulin therapy conduct their own accu-checks for blood sugar levels.   The number of accu-checks an inmate completes daily is based on his individual treatment plan.   The machines used to check blood sugar levels are maintained at HSU.   Inmates are responsible for performing these checks and recording their blood sugar levels in a diabetic log.   Blood sugar levels are also recorded digitally to allow the staff to cross check the inmates' self-reported levels.

Inmates on "sliding scale regular insulin therapy" use their blood sugar levels to determine whether they need to take insulin and how much to take.   Sliding scales are also individualized to the inmate.   The inmate is instructed to take a number of regular insulin units when his blood sugar is in a certain range.   Similarly, the inmate is directed

not to take insulin if their blood sugar is at or below a certain number, as well as to contact HSU if it is above or below a certain number.  Inmates on insulin therapy also receive a bedtime snack.

Generally, diabetic inmates at Fox Lake are not provided glucose tablets to keep on them or in their cell; rather, the tablets are maintained at the Unit Sergeant's desk to be provided to inmates as needed.  Defendants contend that this system insures that HSU is made aware of all incidents of hypoglycemia, so that HSU can determine whether an adjustment to the inmate's treatment plan is warranted.

### III. Williams' Medical Care from March 2009 through August 2009

On March 2, 2009, at 4:00 p.m., Williams' blood sugar level was 51, indicating that he was hypoglycemic -- low in blood sugar.  In response, Nurse Vick issued glucose tablets, but not to keep on him personally consistent with policy.  Vick also noted that Williams was returning to the unit to eat supper.

On March 23, 2009, Dr. Larson saw Williams for a left shoulder injection for tendonitis and bursitis.  Williams declined the injection in favor of addressing questions about his diabetes.  Larson covered self-care and preventative care topics.  Larson also assessed Williams as a patient in need of Type 2 diabetes care, noting that the plan was to enroll Williams in the Diabetes Mellitus Chronic Disease Clinic and the next available injection clinic.  He also ordered that Williams be scheduled for a podiatry consult for diabetic neuropathy.

5

On April 10, 2009, Williams was seen at the UW Health Podiatry clinic by Dr. Jill Migon pursuant to Larson's referral.   Williams complained of diabetic neuropathy, burning, and tingling associated with his feet.   Williams had been seen at the Podiatry Clinic several years before and been fitted with orthotics.   Dr. Migon agreed that a pair of diabetic shoes would be appropriate and issued a prescription.

On May 1, 2009, lab testing was also completed, which revealed that Williams had elevated glucose and triglyceride levels and low HDL cholesterol, although his blood levels were otherwise normal.   Williams' A1C was at 6.0, which was within his reference range.

On May 7, 2009, Williams was seen by a psychiatrist, Dr. Jay Hartz, after he had submitted a request to be seen.   Hartz noted that Williams raised concerns about being extremely irritable and agitated; he also specifically noted concerns about his roommate. On May 14, 2009, Williams refused to have his labs drawn.

On May 18, 2009, at approximately 4:00 p.m., HSU received a call from an officer indicating that Williams' blood sugar was 56.   The officer was instructed to give Williams three glucose tablets, have him eat dinner, and then call the HSU in two hours. The officer called back two hours later to report that Williams' blood sugar level was 131.

On May 20, 2009, Williams saw Dr. Larson for chest pain.   During that appointment, Larson updated Williams' diabetes treatment plan form, noting that Williams' blood sugars were running 70-170, with blood sugars greater than 250 (indicating hyperglycemia) five to six times in the previous three weeks. Larson requested

6

that HSU seek a cardiology consult and ordered a follow-up diabetic clinic in three to six months.

On May 27, 2009, at 10:30 p.m., Captain VanderWerff contacted HSU and indicated that Williams' blood sugar was low, this time in the 30s.  After Williams ate a peanut butter sandwich and drank juice, his blood sugar came up to 88, but then went back down to 58.  The nurse instructed that Williams eat more food, stay awake, and to check his blood sugar as needed.  The nurse advised VanderWerff to call back if there was no improvement.

On June 1, 2009, Dr. Larson prescribed Williams Metformin for one year.  Two days later, on June 3, 2009, Williams was seen for complaints of being out of breath when he would walk the track.  On June 19, 2009, Williams was examined at The Fond du Lac Regional Clinic for complaints of chest pain.  Additional tests were ordered, including a "nuclear stress test."  Williams was also prescribed medication.  Tests were completed on July 1 and July 2, 2009.  Williams had a follow-up appointment with the cardiologist on July 20, 2009.

Williams was seen again in the Fox Lake HSU on July 1, 2009, for prep orders, and on July 21, 2009, to discuss swine flu.  Williams did not raise any concerns directly related to his diabetes during either of these visits and specifically did not complain about an inability to sleep or concerns about falling out of the upper bunk if his blood sugar level dropped.

On July 17, 2009, Williams was seen at the UW Aljan Clinic where he was measured and casts were made for custom diabetic foot orthotics.   On August 4, 2009, Williams had an echocardiogram, which was normal.

On August 11, 2009, Williams was seen by another psychiatrist, Dr. Mohammad Khan, for medication management.   Williams again reported experiencing mood swings and issues with his cellmate.

## IV. Special Needs Policy

In determining special needs and restriction requests, Fox Lake follows Health Services Policy 200:07.   The policy has been in effect since August 26, 2005, and was revised on August 1, 2009.   Under the original version of the policy, registered nurses were allowed to determine special needs and restrictions based on nursing protocols and the guidelines identified in the appendix of the policy.    As of August 1, 2009, requests for special needs and restrictions were to be addressed by a special needs committee consisting of a designated nurse and security liaison.   The revised policy directs the special needs committee to rely on established nursing protocols and the guidelines set forth in the appendix of the policy in determining whether to authorize special needs.

The guidelines provide that the special needs committee can approve a low bunk restriction for the following conditions:

- Acute injury (temporary restriction for 6 weeks or less), does not require committee/nurse review;

- Significant symptomatic cardiovascular disease (can be permanent if condition is not expected to improve);

- Obesity, BMI of greater than 40 and significant mobility issues present;

- Elderly, more than 65 years old;

- Post-operative (temporary restriction based on type of surgery for two months or less), temporary restriction does not require committee review;

- Seizure diagnosis;

- Pregnancy (20 weeks and greater gestation); and

- Blindness.

At the time of his transfer to Fox Lake in January of 2009, Williams maintains that his medical file contained "past authorizations" for "both a lower bunk and glucose tables." (Pl.'s PFOFs (dkt. #17) ¶ 2.A.)  The record, however, does not support this proposed finding of fact.  Williams' transfer screening form entering Fox Lake, dated January 16, 2009, does not identify any medical restrictions or special needs.  Williams' transfer screening form entering Green Bay Correctional Institution, dated May 20, 2008, also does not identify any medical restrictions or special needs.  Williams disputes defendants' proposed factual findings, but fails to submit any evidence in support of his counter-position.  Indeed, the documentary evidence submitted by defendants forecloses any dispute.  (Meier Aff., Ex. 1001 (dkt. #10-1) 16-17; *id.*, Ex. 1001 (dkt. #10-5) 297-99.)[3]

---

[3] As discussed in the next section, Williams does refer to a "medical restriction form" in one piece of correspondence with defendant Meier in late July 2009, but no other.  Nor

**V. Request for Lower Bunk Accommodation**

On July 27, 2009, Dr. Larson examined Williams for chest pain progress and special needs. Larson noted that Williams' focus was on procuring special needs, such as a low bunk, double mat, extra pillows, and skin moisturizers. Williams claimed that he was having too much neck and back spasms for an upper bunk or a single mat. Williams also requested being placed on a unit closer to the HSU. After examining Williams, Larson noted no difficulty with transfers or gait and no major orthopedic disabilities. Larson also assessed his cardiac status, noting that his cardiology tests were normal. Apparently as a result, Larson indicated that the criteria for special needs were not met, including a low bunk restriction.

On July 27, 2009, Williams wrote a letter to Nurse Meier, stating as follows:

> I just saw Doctor Larson today and I ask that my lower bunk restriction be reinstated due to my back spasm that I have from a car accident due to my blood sugar dropped at night.
>
> I've dealt with this top bunk since I've been at [Fox Lake] and it's getting complicated and it's just a matter of time before I fall and serious[ly] hurt myself.
>
> I'm enclosing my medical restriction form to show you that I've had a low bunk at every [Institution] I've been and I'll stop at nothing to pursue this matter. "Please return."
>
> He also would not address the issue of my blood sugar dropping at night. I'm very concern about this issue -- I don't want to go into a Diabetic coma or become unresponsive like Inmate Westly. Please respond.

---

do any of the Green Bay medical records reflect any authorization. Even if Williams had been authorized at some former institution for placement in a lower bunk, there is no evidence the individual defendants here actually saw it, nor that they would have been bound by it.

(Meier Aff., Exhibit 1001 (dkt. #10-5) 294-99.)  Williams explains that by "'stop at nothing,' he meant that he would file a formal grievance with the institution complaint examiner, and write to officials in Madison, Wisconsin with his concerns."  (Pl.'s PFOFs (dkt. #17) ¶ 2.I.)

On July 29, 2009, Meier responded as follows:

> I have received your correspondence dated 7/27/09 requesting a lower bunk and your concerns about falling out a bed due to back pain, low blood sugars and fear of coma.  I have reviewed your medical record.
>
> Dr. Larson addressed your request on 7/22/09 and you do not meet the criteria for a lower bunk.  You have received education on your diabetic condition and the last low blood sugar noted was 5/29/09 in your medical chart.  If you would like to work with a nurse for further diabetic education, please contact HSU and this will be scheduled for you.

(Meier Aff., Ex. 1001 (dkt. #10-5) p.289.)

On August 27, 2009, Williams submitted a Health Services Request ("HSR") form, stating:

> I am a diabetic and lately I have been experiencing back spasms.  I would like a lower bunk authorization because of my "blood sugar" situation and lately it has been extremely painful for me to jump up, and jump down, from the upper bunk I am assigned.
>
> I ask that you please review my medical file and also my "blood sugar" logs that will show I am subject to sudden drops in my "blood sugars".  At night I have been experiencing low blood sugars and back spasms.  This can be verified with the unit logs & my blood sugar readings.  My concern is that I am going to go into a diabetic seizure that could lead to a life threatening situation, and bodily harm to me.  I have difficulty getting up onto the top bun[k], and getting down from the top bunk.

> Please have the M.D. review my chart, I don't have $7.50 to
> afford a co-pay.

(Meier Aff., Ex. 1001 (dkt. #10-5) 302.)  An August 28, 2009, notation indicated that

this request was being referred to M.D.  (*Id.*)

On September 3, 2009, Dr. Larson referred Williams' request to the special needs

committee consistent with the policy at that time.   Meier was unable to find

documentation in Williams' medical record as to whether the special needs committee

considered Williams' request before then.

## VI. Hypoglycemic Events Leading up to Fall From Top Bunk

On September 14, 2009, Sergeant Schwab completed Incident Report #1304418,

which stated:

> On the above date and time [Sept. 14, 2009, 12:05 a.m.] I
> Sgt. Schwab was assigned to housing Unit 2C when inmate
> Williams Mark, #177772 came to the dayroom and said he
> felt his blood sugar was low.  Upon receiving the institutions
> accu-check his blood sugar registered at (51).  He was given
> proper food and glucose gel to consume and after about 30
> mins it returned to (120) and I/M Williams returned to his
> room.  Let it be known that this is the 2nd consecutive day
> I/M Williams has had this medical issue.  On 09/12/09 he
> approached the Sgt.'s desk stating the same issue and his
> blood sugar tested out at (62) and after a few minutes of
> eating and consuming a glucose tube it returned to (150).  I
> think this issue needs to be addressed by HSU staff.

(Meier Aff., Ex. 1002 (dkt. #10-7).)   A second incident report was completed on

September 16, 2009, indicating that Williams' blood sugar tested at 58.  (*Id.*, Ex. 1003

(dkt. #10-8).)

Between September 14 and September 17, 2009, Williams was supposed to come to the HSU four times a day to check his blood sugar.  During that time, he never reported to HSU staff that he was having a problem with low blood sugar at night.

Defendants assert that it can take several days before the HSU receives copies of incident reports which are forwarded to HSU for review.  Still, defendant Meier acknowledges reviewing the September 14th and 16th incident reports and having Nurse Terry Kiser see Williams on September 18, 2009.  During this appointment, Williams stated that he had difficulty taking the prescribed dose because he used his own sliding scale due to air bubbles.  Williams also stated that he did not have time to remove air bubbles from the syringe, so he would have to "estimate" the amount given; at times, he would also add units if he deemed it necessary.  Nurse Kiser attempted to educate Williams, but found those efforts unsuccessful and further found Williams non-compliant.

That evening, at approximately 11:45 p.m., Lieutenant VanderWerff contacted the HSU's on-call nurse, Gwendolyn Vick, at home regarding Williams.  VanderWerff reported that Williams was lying on the floor, complaining of hip pain and claiming that he could not move off the floor after falling out of his bunk.  Nurse Vick advised VanderWerff to take Williams to the emergency room via ambulance.  Sergeant Hendrickson completed a report regarding this incident, which provides in relevant part that:

> On the above date and time I was informed by inmate Weinheimer . . . that his cell[] inmate Williams . . . fell out of his top bunk.  When I arrived at room 255, I noticed inmate Williams laying face down on the floor.  I called to him and

13

> he responded.   I then continued to talk to Williams and
> gather information on what had happened. He stated that he
> fell off of the top bunk while trying to get down cause his
> blood sugar was low.  He also told me that his right side and
> hip hurt.   I notified control and Captain VanderWerff at
> 2331.   Sgt Harteua brought a tube of glucose and inmate
> Williams administered it to himself at 2335.    I then
> instructed Officer West to get the diabetic test kit from
> control. Inmate Williams proceeded to check his blood sugar
> at 2340, which was at 35.  Inmate Williams was then given
> (2) glucose tablets at 2344.  While waiting for the ambulance
> to arrive, inmate Williams stayed responsive and on the floor
> of his cell because he could not get up.  Brooks ambulance
> arrived to the unit at 2400.  Brooks ambulance departed the
> unit with inmate Williams in full restraints and Sgt Schwab.

(Meier Aff., Ex. 1004 (dkt. #10-9).)

Williams was sent to the Waupun Memorial Hospital Emergency Room where he complained of right shoulder and right pelvis pain.   X-rays were taken, which were negative for any fracture.  Williams was given an injection of Toradol for pain.  Williams alleges that he was "seriously hurt" on September 18, 2009, and that since the fall he "has experienced sweating, shakiness, weakness, dizziness, headaches and blurred vision." (Pl.'s PFOFs (dkt. #17) ¶ 2.D.)


**VII.   Post-Fall Treatment and Developments**

The day after his fall on September 19, 2009, at approximately 9:27 a.m., Williams was seen by HSU nurse Vick.  According to Vick's notes, Williams stated that his "shoulder and hip are sore.  Tired."  (Meier Aff., Ex. 1001 (dkt. #10-1) p.64.)  Vick noted that Williams ambulated with a steady gait.  Williams was instructed on the use of

14

ibuprofen and an ice bag.  Williams' regular insulin was removed from accu-check, and he was instructed to notify staff if his blood sugar was greater than 200.

Later that same day at 7:50 p.m., Williams was at the HSU for an accu-check.  At that time, he requested a lower bunk, and his request was refused by Vick.   Since Williams' blood sugar was 294, he was allowed to take six units of regular insulin.[4]  At approximately 11:45 p.m., Sergeant Hendrickson completed an incident report in which he reported that Williams' blood sugar was at 58.  After consuming food and beverages, Williams' level had increased to 152.  Hendrickson reported that "[t]his is the second consecutive night that Williams' blood sugar has dropped."  (Meier Aff., Ex. 1005 (dkt. #10-10).)

The next day, September 20, 2012, Williams again saw Nurse Vick.  According to Vick's notes, Williams stated "Do I have to do this everyday?  I don't want to deal with you.  I'm not going to take it.  I hope I fall out."  (Meier Aff., Ex. 1001 (dkt. #10-1) 64.) According to his medical records, Williams' blood sugar was 275, indicating he was hyperglycemic.  He was offered his regular insulin, but refused to take it.

On September 21, 2009, Williams was seen again by HSU and a Diabetes Treatment Care Plan form was completed.  Hypoglycemic events were noted.  The form also noted questionable compliance with his treatment plan.  A follow-up was scheduled in two weeks.  On that same day, Williams was authorized to have a low bunk until March 21, 2010.

---

[4] Defendants now acknowledge that this amount was in error.  Williams should have been instructed to take 4 units.

## VIII.  Compliance Issues

Defendants also submit evidence that Williams was not compliant with his diabetes treatment plan, causing his low blood sugars.   Williams' diabetic log for September 2009 shows that Williams frequently took more insulin than prescribed, sometimes more than double the dose provided in his personalized sliding scale chart. (Defs.' PFOFs (dkt. #11) ¶ 98.)  Williams disputes this proposed finding of fact, averring that he "never took more insulin tha[n] he was prescribed."  (Pl.'s PFOFs (dkt. #17) ¶ 2.L; *see also id.* at ¶ 2.Q ("Mark Williams has always adhered to his care plan and he has never intentionally been non-compliant with his diabetic plan of care.").)  Defendants maintain that the hypoglycemic event that lead to Williams' fall could have been avoided if he had followed his diabetes treatment plan.[5]

## OPINION

Defendants seek summary judgment on plaintiff's claim that they violated Williams' due process rights under the Eighth Amendment by acting with deliberate indifference to his serious medical need, as well as on his claim that they were negligent or committed medical malpractice under state law.

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."  *Goldstein v. Fid. & Guar. Ins. Underwriters, Inc.*, 86 F.3d

---

[5]  Defendants also submit evidence demonstrating that following the fall Williams routinely refused treatment for his diabetes or otherwise failed to follow his treatment protocol.  (Defs.' PFOFs (dkt. #11) ¶¶ 101-116.)

749, 750 (7th Cir. 1996) (citing Fed. R. Civ. P. 56); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  The judge's function on summary judgment "is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  All reasonable inferences from undisputed facts are drawn in favor of plaintiff as the nonmoving party.  *See Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999).  Even under this lenient standard, plaintiff is obligated to "show through specific evidence" that (1) "a triable issue of fact remains on issues for which [he] bears the burden of proof at trial" and (2) "the evidence submitted in support of [his] position must be sufficiently strong that a jury could reasonably find for [him]." *Knight v. Wiseman*, 590 F.3d 458, 463-64 (7th Cir. 2009) (internal quotation omitted).  Williams fails to meet either burden.

## I.  Deliberate Indifference Claim

Williams claims that defendants were deliberately indifferent to his diabetes by (1) failing to give him a lower bunk; (2) refusing to allow him to keep glucose tablets on his person; and (3) failing to place him on "assist status," which requires a nurse to be present during insulin injections.

For plaintiff to survive summary judgment on his claim that the defendants were deliberately indifferent to Williams' serious medical needs, he is required to provide evidence from which a reasonable jury could find that:  (1) Williams had an objectively serious medical need; and (2) defendants were deliberately indifferent to it.  *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).  In moving for summary judgment,

17

defendants concede that Williams' Type II diabetes is a serious medical need.  (Defs.'
Opening Br. (dkt. #8) 13.)

In *Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010), the Seventh Circuit succinctly
described the proof required to establish "deliberate indifference":

> [T]he plaintiff must show that the official acted with requisite
> culpable state of mind.  This inquiry has two components.
> The official must have subjective knowledge of the risk to the
> inmate's health, and the official also must disregard that risk.
> Evidence that the official acted negligently is insufficient to
> prove deliberate indifference.  Rather, deliberate indifference
> is simply a synonym for intentional or reckless conduct, and
> that 'reckless' describes conduct so dangerous that the
> deliberate nature of the defendant's actions can be inferred.
> Simply put, an official must both be aware of facts from
> which the inference could be drawn that a substantial risk of
> serious harm exists, and he must also draw the inference.
> Even if a defendant recognizes the substantial risk, he is free
> from liability if he responded reasonably to the risk, even if
> the harm ultimately was not averted.

*Id.* at 620 (internal quotations and citations omitted).  Plaintiff has failed to offer
sufficient evidence of either defendants' alleged indifference.


### A.  Dr. Larson

The undisputed facts demonstrate that Dr. Larson saw Williams on at least five
occasions over the relevant time period from March 2009 through September 2009.  On
March 23, 2009, Dr. Larson first treated Williams.  During that visit to HSU, Larson
provided diabetes self-care advice and referred him to a diabetes clinic and to a podiatry
consult.  On May 20, 2009, Larson saw Williams for cardiology-related issues, but noted

on that visit that Williams' blood sugar levels were running high.  On June 1, 2009, Larson prescribed a one-year prescription of Metformin.

On July 27, 2009, Dr. Larson again saw Williams.  Accordingly to his contemporaneous notes from that visit, Williams requested various special needs accommodations, including a low bunk assignment.  Dr. Larson also noted that Williams' focus seemed to be on these special needs requests, which were prompted by reported neck pain and back spasms.  There is no indication in the record, at least at this time, that Williams' request was based on concerns about hypoglycemic events or was otherwise related to his diabetes.  Moreover, on July 27, 2009, Williams' medical record reflected his having only one hypoglycemic event, which had occurred two months ago.

Based on this alone, Williams has not presented sufficient evidence from which a reasonable jury could find that Larson had subjective knowledge of sufficiently serious hypoglycemic events to pose a threat to Williams' safety using the top bunk.  *Gayton*, 593 F.3d at 620 ("The official must have subjective knowledge of the risk to the inmate's health[.]").  Given that Williams requested a low bunk ostensibly due to pain, Dr. Larson assessed his physical condition and found no major orthopedic or neurological conditions that would have warranted a low bunk restriction.  On these facts, the court finds that no reasonable jury could find Larson responded unreasonably to the risk, especially in light of the evidence of his overall care for Williams and his diabetic condition.

On August 27, 2009, Williams submitted a written request for a lower bunk to HSR in which he specifically requested such authorization "because of my 'blood sugar' situation," and noted a concern about "diabetic seizure."  (Meier Aff., Ex. 1001 (dkt.

19

#10-5) 302.)  On September 3, 2009, Dr. Larson reviewed Williams' renewed request for a low bunk accommodation and referred the request to the special needs committee. Again, however, no reasonable jury could find that Larson disregarded the risk that Williams may fall out of his bed based on hypoglycemic event, or otherwise acted unreasonably, in referring Williams' request to the special needs committee consistent with state policy.  Williams contends that Larson could have authorized a lower bunk on a temporary basis, but provides no basis in the policy for such an allowance.  Even if the policy contemplated authorization on a temporary basis, no reasonable jury could find Dr. Larson's failure to grant such a request so reckless as to constitute deliberate indifference, except perhaps with the benefit of hindsight.

### B.  Holly Meier

The same day that Dr. Larson rejected Williams' first request for a low bunk, Williams wrote to Nurse Meier, requesting the same accommodation because of "back spasm."  (Meier Aff., Ex. 1001 (dkt. #10-5) 294-99.)  In this letter, Williams also raised concerns about his blood sugar dropping at night.   Meier relied on Dr. Larson's finding that Williams did not meet the criteria for a low bunk restriction.  *See Johnson v. Doughty*, 433 F.3d 1001, 1005 (7th Cir. 2006) (finding nurse's actions reasonable, in part, because she relied on "doctor's professional opinions").  Moreover, Meier responded to Williams request by offering him further diabetes education to address his concerns.   Neither action is evidence of deliberate indifference.

Meier's next involvement with Williams involved her scheduling him to see a nurse September 18, 2009, the morning before his fall.  Meier did this after reviewing the September 14th incident reports indicating that Williams had had a series of low blood sugar incidents.  No reasonable jury could find that Meier acted unreasonably in her response to these incident reports, except again with the benefit of hindsight.

Moreover, Williams has not demonstrated that Meier played any role in reviewing his August 27, 2009, low bunk request, which Dr. Larson had forwarded to the Special Needs Committee.  Even if she had, the committee reviewed and approved his request approximately two and a half weeks after Dr. Larson referred it to the committee.  Based on all of this, the court finds that no reasonable jury could find that Meier acted with a deliberate indifference in initially denying Williams' request for a low bunk restriction and in her response to his low blood sugar incidents in the week preceding his fall.

Williams also complains about Fox Lake's policy of having glucose tablets at the unit desk, rather than on the inmates personally.  The reason underlying the policy is valid.  Nothing in the record suggests that Williams requested glucose tablets personally.  Certainly, this was not part of his special needs requests.  Finally, the record reflects that the correctional officers assigned to Williams' unit seemed well-equipped to deal with his hypoglycemic events, regularly and timely providing him with glucose tablets or gel, and reporting hypoglycemic events to HSU.

As for Williams' other ancillary concern -- that the defendants were deliberately indifferent in failing to place him on "assist status" -- Williams also fails to demonstrate that he brought this concern to either individual defendants' attention, or otherwise

21

establish that defendants should have been aware of any risk to Williams' safety. To the contrary, as far as the court can tell, this concern was raised for the first time in plaintiff's response brief and is at odds with Williams' position -- contrary to defendants' -- that he "never took more insulin tha[n] he was prescribed." (Pl.'s PFOFs (dkt. #17) ¶ 2.L.) In light of Williams' position that he was compliant in his self-treatment of diabetes, the court cannot conceive how placing him on "assist status" would have prevented his hypoglycemic episodes.[6] Accordingly, the court concludes that no reasonable jury could find either defendant deliberately indifferent for not recognizing a need to place Williams on assist status.

## II. Medical Malpractice Claim

Defendants also move for summary judgment on Williams' negligence claim.[7] Under Wisconsin law, it is well-established, and plaintiff does not dispute, medical

---

[6] Even adopting defendants' position that he was not compliant, there is no evidence in the record that anyone was aware of Williams' compliance issues prior to September 18, 2009, the date of his fall.

[7] Having found that defendants are entitled to summary judgment on plaintiff's only federal claim, this court would typically dismiss Williams' state law claim without prejudice to be refiled in state court consistent with "the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction."). Here, however, defendants' entitlement to summary judgment on Williams' state court claim is so clear, the court will decide this issue as well. *See Groce*, 193 F.3d at 502 (explaining that a court may depart from "usual practice" and continue to exercise supplemental jurisdiction over "'doomed litigation' that will only be dismissed" in state court); *In re Repository Tech., Inc.*, 601 F.3d 710, 725 (7th Cir. 2010) ("[W]hen a state-law claim is

malpractice claims require expert testimony to establish the standard of care.  *Carney-Hayes v. Nw. Wis. Home Care, Inc.*, 2005 WI 118, ¶ 37, 284 Wis. 2d 56, 699 N.W.2d 524 (citing *Kuehnemann v. Boyd*, 193 Wis. 588, 214 N.W. 326 (1927)).  Plaintiff counters that his claim is for "negligence," not for medical malpractice, but the nomenclature does not change the treatment of Williams' claim under Wisconsin law.  Indeed, medical malpractice is simply a subset of "negligence" claims.  *See Jeckell v. Burnside*, 2010 WI App 71, ¶ 10, 325 Wis.2d 401, 786 N.W.2d 489, 2010 WL 1233970 (unpublished) (listing the elements of a claim for medical malpractice as the same as a claim for negligence).  In the medical context, a negligence claim requires a showing of expert testimony, absent special circumstances not present here.  *See Jandre v. Wis. Injured Patients* & *Families Comp. Fund*, 340 Wis. 2d 31, 118, 813 N.W.2d 627, 669 (2012) ("[E]xpert testimony is almost always needed to support a finding of negligence in a medical malpractice case.").  Because Williams failed to submit expert testimony in support of his negligence claim, the court will grant summary judgment to defendants on this claim as well.

---

clearly without merit, it invades no state interest-on the contrary, it spares overburdened state courts additional work that they do not want or need-for the federal court to dismiss the claim on the merits, rather than invite a further, and futile, round of litigation in the state courts.") (internal quotation omitted).

ORDER

IT IS ORDERED that:

1) defendants Holly Meier and Dr. Charles Larson's motion for summary judgment (dkt. #7) is GRANTED; and

2) the clerk of the court is directed to enter judgment in favor of defendants and close this case.

Entered this 25th day of September, 2013.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

24